## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**TYRONE CRUMP**                                    **CIVIL ACTION**

**VERSUS**                                          **NO.  14-0416**

**BURL CAIN, WARDEN LOUISIANA**                     **SECTION "E"(2)**
**STATE PENITENTIARY**

## REPORT AND RECOMMENDATION

This matter was referred to a United States Magistrate Judge to conduct hearings, including an evidentiary hearing, if necessary, and to submit proposed findings and recommendations for disposition pursuant to 28 U.S.C. §§ 636(b)(1)(B) and (C) and, as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases.  Upon review of the submissions to date, I have determined that a federal evidentiary hearing is unnecessary. See 28 U.S.C. § 2254(e)(2).[1]  For the following reasons, I recommend that (1) the petitioner's request for a stay of these proceedings be **DENIED**, and (2) the petition itself be **DISMISSED WITHOUT PREJUDICE** for failure to exhaust state court remedies.

---

[1]Under 28 U.S.C. § 2254(e)(2), whether to hold an evidentiary hearing is a statutorily mandated determination.  Section 2254(e)(2) authorizes the district court to hold an evidentiary hearing only when the petitioner has shown either that the claim relies on a new, retroactive rule of constitutional law that was previously unavailable, 28 U.S.C. § 2254(e)(2)(A)(i), or the claim relies on a factual basis that could not have been previously discovered by exercise of due diligence, 28 U.S.C. § 2254(e)(2)(A)(ii); and the facts underlying the claim show by clear and convincing evidence that, but for the constitutional error, no reasonable jury would have convicted the petitioner. 28 U.S.C. § 2254(e)(2)(B).

I.      FACTUAL BACKGROUND

        The petitioner, Tyrone Crump, is a convicted inmate currently incarcerated in the

Louisiana State Penitentiary in Angola, Louisiana.[2]  On September 20, 2007, Crump and

a co-defendant, Herbert Everett, were indicted by a grand jury in Orleans Parish on one

count of first degree murder.[3]  The indictment was later amended on March 31, 2009, to

charge Crump and Everett with one count of second degree murder.[4]  The Louisiana

Fourth Circuit Court of Appeal summarized the facts of the case as determined at trial

as follows:

        At approximately 4:30 p.m. on 30 June 2007, New Orleans Police
    Department ("NOPD") Detective Orlando Matthews received a call from dispatch
    concerning gunshots fired at North Galvez and Conti Streets.  He arrived and secured
    the scene and in doing so, he observed several spent bullet casings and glass in the
    middle of the street.  He also noted that in the chaos several people were milling
    around the area yelling names and other information.  Detective Matthews identified
    the state's exhibits 3B through 3K as photographs of the crime scene - street signs,
    spent bullet casings, broken glass and his police M-Cop vehicle.[5]  Detective
    Matthews remained on the scene until NOPD Crime Scene Specialist, Derrick
    Melder, collected the spent bullet casings.  The detective did not interview any
    witnesses, but he learned that the victim had been transported to the hospital by a
    friend.
        Detective Matthews identified police reports describing the perpetrators as
    two young black males; the report describes the clothing-blue jeans and black shirt-
    of only one of the suspects.  Further, the report indicated that "subject fled on foot

_____

[2]Rec. Doc. No. 1.

[3]Rec. Doc. No. 1, p.1; State v. Everett, 96 So.3d 605, 612 (La. App. 1st Cir. 2011).

[4]Id.; Everett, 96 So.3d at 612.

[5]"FN1. Detective Matthews described the vehicle as a mobile home."

down Conti, river bound ..." in the direction of the Iberville Housing Project. Detective Matthews did not obtain any names or nicknames of the suspects.

NOPD Officer Steven Lindsey also responded to a signal 94 call (shots fired) at the intersection of Conti and North Galvez Streets. Detective Matthews radioed Officer Lindsey with a report of spent bullet casings and broken glass at the scene. After speaking with Detective Matthews, Officer Lindsey received a call from dispatch, advising him that the victim was en route to University Hospital.

Officer Lindsey started a Major Offense Report Form ("MORF") as Sergeants B. Mitchell and R. Dassel arrived.  Sergeant Mitchell requested that Officer Lindsey relocate to University Hospital to determine the victim's status. As Officer Lindsey pulled up to the hospital, he observed a light blue 2007 Chrysler Pacifica van parked in the parking lot with a black male standing next to it.  The black male identified himself as Karl Allen ("Allen"), brother of the victim, and the person who transported the victim to the hospital.  Officer Lindsey observed multiple bullet holes in the passenger's side of the van, windows shot out, and the front passenger seat covered with blood.  The state and defense stipulated to the authenticity of the state's photographs of the van-Exhibits 3-L through 3-S.

Dr. Mills, the emergency room physician and head trauma surgeon, reported to Officer Lindsey that the victim was in very serious condition as a result of seven gunshot wounds. Officer Lindsey relayed the information to his ranking officer. He secured the van and waited for NOPD Crime Lab personnel to process the vehicle. As Officer Lindsey waited, Detective Lester Marshall and Sergeant Bradley Rhodes arrived.  Lindsey directed them to Allen.

Under cross examination, Officer Lindsey agreed that a good deal of the blood in the van was mostly in the rear passenger side of the vehicle, but that there were significant blood stains in the front passenger seat as well.  He identified the MORF bearing item number F-36397-07 as the form authored by Detective Marshall.

Detective Marshall, the case investigator, reported to University Hospital, accompanied by Detective Charles Augustus.  Detective Marshall inspected the van and spoke with Allen. He also spoke with the victim, who told him, "I don't know what happened. I didn't see it coming." Detective Marshall also talked to Allen's ten-year old son, Stokes; Allen and his son were both in the vehicle at the time of the shooting. He also spoke with Davis, who was at the scene at the time of the shooting. Detective Marshall relocated to the scene and spoke with the Riley Sanders ("Sanders"), owner of R&N Auto Sales, the business where the shooting occurred.

While under cross-examination, Detective Marshall identified the MORF of this incident.  He learned from Allen that Sanders was the owner of the business and on the scene when the shooting began.  Sanders, however, denied knowing anything about the incident.

Specialist Melder, tasked with photographing, collecting, and preserving evidence at the scene, retrieved ten bullet casings-seven .40 caliber and three .357 caliber-and he placed them into Central Evidence and Property.

3

NOPD Crime Scene Technician Aven Cooper's ("Cooper") job entails photographing and searching for evidence at crime scenes. On 20 July 2007, she processed the blue Pacifica van involved in this shooting pursuant to the request of Detective DeCynda Barnes. Cooper identified state's Exhibit 8 as the report of her findings regarding the van-photographs of the van's driver's side door displaying bullet holes and broken glass, the exterior of the rear passenger door, and a spent bullet confiscated from the driver's side, all of which she submitted to Central Evidence and Property.

Orleans Parish Coroner's forensic pathologist, Dr. Samantha Huber, autopsied the victim's body in July 2007. Her autopsy protocol, state's Exhibit 13, reflects that the victim was shot seven times. The fatal shot entered the victim's back, went into his abdominal cavity, hit the left kidney, the spleen, the pancreas, the liver, and the heart and lodged in the victim's left lung, causing massive bleeding.[6]

NOPD Officer and firearms examiner, Kenneth Leary, Jr., has the task of determining whether a bullet casing retrieved from a crime scene was fired from one particular weapon to the exclusion of all others. Officer Leary accomplishes this through microscopic examination of firing pin impressions, breech face markings, and striation marks present on fired bullets which are compared to each other and determines whether they were fired from the same weapon. Officer Leary tested the bullet casings retrieved from the scene and determined that casings were fired by two different weapons-a .40 caliber pistol and a .357 caliber semi-automatic pistol.

Detective Barnes took over the investigation of this case on 11 July 2007. She contacted the victim's next of kin and visited the crime scene. Until she studied the initial report and the MORF, she had no suspects. She spoke to approximately six to eight individuals associated with the case, including Ms. Patricia Moore (the victim's mother), Davis, who made a tentative identification of Crump, but was unable to identify Everett, Allen,[7] Stokes, and Sanders.

Detective Barnes' investigation led her to the discovery of two eyewitnesses-husband and wife, Sanders and Nekeia,[8] where the shooting occurred. When presented with two six-person photo lineups prepared by Detective Barnes, Nekeia identified Crump as the person she saw shoot the victim. From the second photographic lineup, Sanders identified Everett as the other shooter. Sanders identified Crump from the photographic lineup he viewed, but he could not identify Everett. Based upon this information, Detective Barnes obtained arrest warrants for Crump and Everett as well as search warrants for their residences. He [sic] also

---

[6]"FN2. The victim died of his injuries the day after the shooting."

[7]"FN3. Allen died shortly after this incident."

[8]"FN4. Nekeia and Sanders married after this incident."

obtained a taped statement from Nekeia in which she explained her knowledge of the shooting.

Execution of the search warrant for Crump's residence produced a black t-shirt, paper work containing Crump's name, and a photograph of Crump holding a black automatic handgun. The search of Everett's residence yielded .357 Sig bullets, .45 caliber bullets and one .32 caliber bullet. The murder weapon was never recovered.

Stokes was in the van with his uncle, the victim, who was driving, and his father on their way to the car repair shop on North Galvez and Conti Streets. As they pulled up to the car shop, a man came to the passenger side of the car to speak with his father. Shortly thereafter, two black males approached the left door of their car. Stokes heard his father say, "There go Pookie and Herb" as the men began firing into the van. The victim was shot about eight times. Allen pulled the victim from the driver's seat into the rear of the van and drove the victim to the hospital. Stokes gave a statement to two police officers at the hospital.

Orleans Criminal Sheriff Deputy Alvin McClean, Sr. was standing across the street from R and N [sic] Auto Sales when he heard gunshots. He called 911 and spoke with officers who arrived at the scene. He drove through the neighborhood with the officers searching for a vehicle seen fleeing the area.

Nekeia had a conviction for simple assault. On 30 June 2007, she co-owned a used car lot at Conti and Galvez Streets. On that day, her car, a yellow truck, and a blue Pacifica van were parked at her business. Sanders, Davis, Allen, and the victim were at the location hanging out. She was standing in front of her shop speaking with Davis when a blue Chrysler Pacifica van pulled up. She did not know the occupants of the van. Sanders approached the right side of the van to speak with Allen. Three or four minutes later, she observed two men coming from the neutral ground (median) toward the van. Davis told her that the men were "Pookie and Herb." As one of the men stepped off the neutral ground, he pulled a handgun from under his shirt, walked to the van, and started shooting into the driver's side at the victim. When the shooting started, she was standing approximately fifteen feet from the shooter, allowing her to see his face. Nekeia identified Crump in court as the man she saw shoot the victim. Next, she noticed the second armed man, which prompted her to take cover under her car. She could not tell whether the second man shot at the van, but she observed Crump walk back to where he came from. She could not say which direction the second man walked.

When the shooting stopped, the van sped away toward Galvez Street and the Iberville Housing Project. In her statement to Detective Barnes, Nekeia said she assumed that Allen drove the van from the passenger seat with the use of his prosthetic leg. As the van pulled away, she left in her car to go home, but she returned to the scene about two or three minutes later. The first police arrived about five minutes later, and she gave a statement to an officer. Two or three weeks after the incident, Nekeia met with Detective Barnes, repeating what she saw. She advised Detective Barnes that she could identify the shooters. From the first photo

5

lineup, Nekeia identified Crump. From the second lineup, she identified Everett. On direct examination, Nekeia admitted that Sanders was presently in jail for dealing drugs, having served two years of a twenty-year sentence. She denied speaking to anyone in the federal government about her husband's sentence. Finally, she made an in court identification of Everett as the other gunman.

Nekeia identified pictures of the auto business and the surrounding area. She also pointed out where the Pacifica van was parked at the time of the shooting. She said that Sanders ran the business, which involved performing body work, mechanical repairs, et cetera. When she met with Detective Barnes after the shooting she did not name either suspect because she was not asked their names. In pre-trial hearings she claimed she did not know either of the suspects, but testified at trial that she knew them at the time of the shooting. In addition, Nekeia verified that her husband pled guilty to distribution of cocaine, and that he went into federal custody on 6 July 2007. However, she denied that her husband was a government informant testifying in this case in hopes of reducing his twenty-year sentence. She verified that at the time of the shooting, her husband was out on bond from both a federal and state charge. She emphatically stated that she was testifying because of the pain the victim's mother had endured.

Nekeia did not know the defendants' names at the time of the shooting, only their nicknames-"Pookie" and "Herb." Her friend told her their real names. She also said that she did not want to be seen talking to the police because she did not want people to consider her a "rat" or a "snitch." She denied being offered anything in return for her testimony. Also, she said that her testimony was truthful.

Sanders was arrested on federal distribution of crack cocaine charges on 1 December 2006. He remained in jail until he bonded out three weeks later. His bond was revoked as a result of his arrest on a state distribution of marijuana charge in June of 2007.[9] His arrest on the state charge and his bond revocation both occurred before this shooting on the 30 June 2007. Sanders pled guilty to the federal charge in June 2007 and was sentenced to twenty years. As a part of his plea agreement, Sanders was required to cooperate with federal agents, including working as an informant and reporting any criminal activity he saw. At the time of the shooting, Sanders was scheduled to turn himself in to federal authorities on 6 July 2007.[10] He said that neither he nor his wife was promised or given anything by the state or the federal government for his testimony in this case. At the time of trial, he has already served two years of his twenty-year sentence.

At about 4:30 p.m. on the day of the shooting, Sanders, Nekeia, Davis, Beatrice Peters, Andre Peters, "Clarence" and "Derek" were hanging out at the auto business that Sanders and Nekeia owned at North Galvez and Conti Streets. The

---

[9]"FN5. The state distribution of marijuana charge was subsequently dismissed."

[10]"FN6. Sanders also had two state convictions for possession of cocaine."

victim, Allen and Stokes arrived at the shop in a blue Chrysler Pacifica van. The victim was driving. Allen sat in the front passenger seat while his son sat in the back seat. While Sanders was leaning into the front passenger window of the van speaking to the victim and Allen, he noticed two men walking across the street from the direction of North Claiborne Avenue. Sanders told the victim to pull off, but it was too late. One of the two men crossed the street and pulled a gun from his under shirt. The man walked to the driver's side and began shooting into the van. Sanders ran to the back of the shop. As he came out, he saw Allen leaning over into the driver's seat driving the van as it sped away from the area. Everybody at the shop scattered but returned shortly thereafter to speak with the police. Sanders identified Crump as the man who shot into the van.

Sanders knew that there were two assailants. He saw them and heard two different gunshot sounds. He told the police he did not see anything because according to his plea deal, he was to contact federal agents. He attempted to reach the NOPD after the shooting but was unsuccessful. A few days later, he turned himself into federal authorities.

In July, federal agents transferred Sanders from the St. Charles Parish jail to the federal building in the central business district of New Orleans. He told the agents what he knew about the shooting. A few days later Detective Barnes spoke to him about the investigation and showed him two photographic lineups. Sanders identified Crump from one of the lineups but could not identify anyone else. He did not speak to his wife about the identification. He said he testified at trial because the victim was his friend.

Detective Marshall was also called as a witness by the defense. He related that on the afternoon of the shooting, he and Detective Charles Augustus went to University Hospital to speak with the victim and any witness who might be at the hospital. Detective Marshall had completed the MORF, which he identified at trial, setting forth the information he gleaned from his investigation. He testified that he spoke to Allen and Stokes on the day of the incident, and that their statements corroborated one another. Stokes told the detective that the victim was at Conti and North Galvez Streets when he was shot. He also told Detective Marshall that when the shooting started, his father threw him to the ground. Stokes also said that he was a passenger in the vehicle when his father drove the victim to the hospital. Stokes described the shooter as a dark-skinned, black male wearing a dark shirt, armed with a blue steel handgun, who shot at the victim from across the street. When the shooting ended, Stokes heard a vehicle speed away. After his conversations with Allen and Stokes, Detective Marshall spoke to Sanders, who said that when the shooting started, he dropped to the ground. Sanders denied seeing the shooters.

On cross-examination by the state, Detective Marshall said the MORF is not meant to be a thorough investigation of the incident. He acknowledged that he did not take down everything witnesses told him, but that he tried to be as accurate as possible. When he testified that Allen's and Stokes' statements corroborated each other, he meant as far as general facts-that Stokes was with Allen at the time of the

shooting, and that Allen threw Stokes down when the shooting began. Neither Stokes, Allen, nor Sanders gave the detective the name of either perpetrator. Detective Marshall observed bullet holes and a large amount of blood in the rear seat of the van.

Next, Detective Matthews testified that he was the first officer at the scene, and that he did not interview any witnesses. He was concerned with preservation of the scene and collection of evidence. He did not remember speaking with Nekeia at the scene.

The defense called Detective Barnes to testify. She stated that from the information on the incident, there was no indication Nekeia spoke to anyone with the NOPD prior to the statement she gave to her on 25 July 2007. When Detective Barnes met with Nekeia at the police station on City Park Avenue, she recounted the incident, and she also gave Detective Barnes the names of the perpetrators.

Nekeia was called as a witness by the defense. She verified that in her taped statement she said that she saw Crump at a store on Franklin Avenue the day after the shooting. After the shooting, she called her sister, Craigshonda Lunkins ("Lunkins"). She also said that she did not see the second man shoot into the van because she got under her car.

Under cross-examination by the state, Nekeia explained that Lunkin's boyfriend and the defendants were best friends.

The defense called Lunkins. Nekeia had called her about the shooting, but Nekeia did not identify the shooters. Lunkins said she testified because Nekeia was not honest in her testimony. Lunkins denied that her boyfriend and the defendants were friends.

(footnotes in original) State v. Everett, 96 So.3d 605, 613-18 (La. App. 1st Cir. 2011).

Crump and Everett were jointly tried before a jury on September 14 through 19, 2009, and were found guilty as charged of second degree murder.[11] On October 5, 2010, the state trial court sentenced each defendant to serve life in prison without benefit of parole, probation, or suspension of sentence.[12]

---

[11]Rec. Doc. No. 1, p. 1; Everett, 96 So.3d at 613.

[12]Rec. Doc. No. 1, p. 1; Everett, 96 So.3d at 613.

On direct appeal, Crump's appointed counsel asserted six (6) alleged errors:[13] (1) The evidence was insufficient to support the verdict in that the identification testimony was unreliable because it was based on biased and prejudiced testimony and inadmissible hearsay. (2) His right to present a misidentification defense was frustrated by the exclusion of Allen's statement to Detective Matthews at University Hospital. (3) The trial court abused its discretion in denying the motion filed by Everett to sever defendants' trials on grounds that Crump might implicate Everett at trial. (4) The trial court erred in refusing to grant a mistrial based on prejudicial and improper comments made by the prosecutor in closing argument. (5) The trial court erred in allowing evidence of other crimes and bad acts in violation of La. Code Evid. art. 404(B) and because Crump was not given notice that the evidence would be introduced by the State. (6) The trial court erred in denying his motion for new trial based on insufficient evidence, newly discovered exculpatory evidence, perjured testimony suborned by the prosecution, the prejudicial errors of the trial court and the interests of justice.

The Louisiana Fourth Circuit affirmed the convictions, finding no merit in any of Crump's claims.[14]   The Louisiana Supreme Court denied Crump's related writ

---

[13]Everett, 96 So.3d at 605.  This was a joint appeal and some of the issues were raised solely by Crump's counsel.  The issues raised solely by Everett or his counsel have not been included.

[14]Id.

application without stated reasons on February 8, 2013.[15]  His conviction and sentence became final ninety (90) days later, May 9, 2013, when he did not file a writ application with the United States Supreme Court.  <u>Ott v. Johnson</u>, 192 F.3d 510, 513 (5th Cir. 1999) (period for filing for certiorari with the United States Supreme Court is considered in the finality determination under 28 U.S.C. § 2244(d)(1)(A)), <u>cert. denied</u>, 529 U.S. 1099 (2000); U.S. Sup. Ct. Rule 13(1).

II.     <u>FEDERAL HABEAS PETITION</u>

In his counsel-filed petition for federal habeas corpus relief in this court, Crump has asserted seven (7) challenges to his conviction:[16] (1) The state courts unreasonably rejected petitioner's claim that in relying on impermissible hearsay and unreliable testimony, the State failed to prove beyond a reasonable doubt that he was a perpetrator in the victim's murder, in violation petitioner's federal constitutional rights to confrontation, cross-examination, counsel and due process of law. (2) The state courts unreasonably rejected petitioner's claim that he was deprived of his federal and state constitutional rights to present a defense. (3) The state courts unreasonably rejected petitioner's claim that he was entitled to a severance from his co-defendant because the joint trial subjected him to prejudicial evidence developed by the co-defendant. (4) The

_____

[15]<u>State v. Everett</u>, 108 So.3d 77 (La. 2013).

[16]Rec. Doc. No. 1, pp. 5-12.

state courts unreasonably rejected petitioner's claim that impermissible evidence of other crimes and bad acts was introduced at trial in violation of the federal and state constitutionally protected right to a fair trial. (5) The state courts unreasonably rejected petitioner's claim that he was entitled to a new trial based on the State's misleading assertions about its role in influencing witness testimony, the discovery of a new witness and the prejudice caused by the joinder of the defendants. (6) The state courts unreasonably rejected petitioner's claim that the State engaged in improper and prejudicial closing argument. (7) The state courts unreasonably rejected petitioner's claim that he was denied effective assistance of counsel as required by the Sixth Amendment and Strickland v. Washington, 466 U.S. 668 (1984).

## III.   STAY OF PROCEEDINGS

Although no separate motion has been filed, Crump requests in the petition itself that the court stay these proceedings to allow him to exhaust available state court remedies as to "a claim or claims" asserted in the case.[17]  The pleadings and the state appellate decision reveal that Crump has failed to exhaust state court remedies regarding his claim of ineffective assistance of counsel.  Based on the information currently available to me, it also appears that Crump bases his first claim, insufficient evidence, on at least three grounds not clearly presented to the state courts.  Those grounds are the

---

[17]Rec. Doc. No. 1, pp. 4, 13.

State's alleged failure to present adequate evidence establishing him as the perpetrator that violated his "rights to confrontation, cross-examination, counsel, and due process."[18]

Thus, it appears, as petitioner implicitly concedes, that at best he has filed a "mixed" habeas petition that includes both exhausted and unexhausted claims. In Pliler v. Ford, 542 U.S. 225, 227 (2004), the Supreme Court addressed the availability of a stay-and-abeyance in connection with "mixed petitions" for habeas relief containing both exhausted and unexhausted claims. Id. The Pliler Court reiterated the long-standing directive that a mixed petition should be dismissed without prejudice to require exhaustion. Id., at 233. The Supreme Court recognized that a petitioner has two choices when faced with dismissal of a mixed petition: (1) return to the state courts to exhaust his claims in full; or (2) amend or resubmit his petition to raise only exhausted claims in the federal district court. Id.

The Supreme Court later held that stay-and-abeyance was an extraordinary remedy not to be made readily available to a habeas petitioner. Rhines v. Weber, 544 U.S. 269, 278 (2005). The Rhines Court cautioned that a stay-and-abeyance "should be available only in limited circumstances," and is appropriate only when the district court determines that there was "good cause" for the failure to exhaust. Id., at 277 (emphasis added).

---

[18]Rec. Doc. No. 1, p. 5.

Stays are improper when the unexhausted claims are "plainly meritless" or where the petitioner has engaged in "abusive litigation tactics or intentional delay."  Id.

In this case, Crump bases his request for a stay on his misconception that the finality of his state conviction was February 23, 2013, and that the end of the federal habeas statute of limitations period would therefore be February 24, 2014.  As noted above, for purposes of federal habeas relief, Crump's conviction and sentence did not become final until May 9, 2013, which was 90 days after the Louisiana Supreme Court denied his post-appeal writ application.  Ott, 192 F.3d at 513.  The federal habeas statute of limitations period would therefore lapse one year from that date, unless otherwise tolled.  28 U.S.C. § 2244.  If he diligently pursues available state court remedies, Crump may further toll that limitations period.

In addition, Crump has not indicated that he has made any effort to pursue his available state court remedies as to the unexhausted claim or claims before seeking federal habeas corpus relief in this court.  The record does not demonstrate any good cause for his failure to do so.  I find no good cause for this court to enter a stay while he attempts to exhaust the new claim(s).

Federal law requires that Crump give the state courts the first and full opportunity to consider all of his claims.  A stay to allow completion of exhaustion must be limited to instances in which good cause is shown for the failure fully to exhaust, Rhines, 544

U.S. at 278, and this is not such a case.  Crump's request for a stay of proceedings should be denied.

IV.    GENERAL STANDARDS OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214, comprehensively revised federal habeas corpus legislation, including 28 U.S.C. § 2254.  The AEDPA went into effect on April 24, 1996[19] and applies to habeas petitions filed after that date.  Flanagan v. Johnson, 154 F.3d 196, 198 (5th Cir. 1998) (citing Lindh v. Murphy, 521 U.S. 320 (1997)).  The AEDPA therefore applies to Crump's petition, which was filed by counsel on February 24, 2014.

The threshold questions in habeas review under the amended statute are whether the petition is timely and whether the claims raised by the petitioner were adjudicated on the merits in state court; i.e., the petitioner must have exhausted state court remedies and must not be in "procedural default" on a claim.  Nobles v. Johnson, 127 F.3d 409, 419-20 (5th Cir. 1997) (citing 28 U.S.C. § 2254(b), (c)).

The State has not yet been ordered to file a response in this case, because, as noted above, Crump concedes in his pleadings that he has not exhausted at least one of his claims.  I find sua sponte that Crump's petition should be dismissed without prejudice

---

[19]The AEDPA, which was signed into law on that date, does not specify an effective date for its non-capital habeas corpus amendments. Absent legislative intent to the contrary, statutes become effective at the moment they are signed into law. United States v. Sherrod, 964 F.2d 1501, 1505 (5th Cir. 1992).

for failure to exhaust state court remedies.   Accordingly, **petitioner is hereby specifically instructed that this report and recommendation is notice to him that this court is sua sponte raising the issue of failure to exhaust state court remedies and that petitioner must submit any evidence or argument concerning exhaustion as part of any objections he may file to this report and recommendation**. Kurtzemann v. Quarterman, 306 F. App'x 205 (5th Cir. 2009) (district court may sua sponte raise failure to exhaust, and notice of and an opportunity to respond to the exhaustion issue must be given) (citing Day v. McDonough, 547 U.S. 198, 209-10 (2006) (addressing limitations) and Magouirk v. Phillips, 144 F.3d 348, 358 (5th Cir. 1998) (addressing exhaustion)).   **The petitioner must also choose to (1) return to the state courts to exhaust his claims in full or (2) amend his petition to dismiss the unexhausted claims and pursue only exhausted claims.**  Pliler, 542 U.S. at 233.

V.     EXHAUSTION OF STATE COURT REMEDIES

"A fundamental prerequisite to federal habeas relief under § 2254 is the exhaustion of all claims in state court prior to requesting federal collateral relief."  Whitehead v. Johnson, 157 F.3d 384, 387 (5th Cir. 1998) (citing Rose v. Lundy, 455 U.S. 509, 519-20 (1982)); accord Preiser v. Rodriguez, 411 U.S. 475, 500 (1973); Nobles, 127 F.3d at 419. "A federal habeas petition should be dismissed if state remedies have not been exhausted

as to <u>all</u> of the federal court claims." <u>Whitehead</u>, 157 F.3d at 387 (citing 28 U.S.C. § 2254(b)(1)(A); <u>Rose</u>, 455 U.S. at 519-20) (emphasis added).

"The exhaustion requirement is satisfied when the substance of the federal habeas claim has been fairly presented to the <u>highest</u> state court." <u>Id.</u> (citing <u>Picard v. Connor</u>, 404 U.S. 270, 275-78 (1971)) (emphasis added). "State prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process," including discretionary review when that review is part of the State's ordinary appellate review procedures. <u>O'Sullivan v. Boerckel</u>, 526 U.S. 838, 845 (1999); <u>accord</u> <u>Duncan v. Walker</u>, 533 U.S. 167, 177-79 (2001).

"A federal court claim must be the 'substantial equivalent' of one presented to the state courts if it is to satisfy the 'fairly presented' requirement." <u>Whitehead</u>, 157 F.3d at 387 (citing <u>Picard</u>, 404 U.S. at 275-78). "This requirement is not satisfied if the petitioner presents <u>new legal theories</u> or <u>new factual claims</u> in his federal application." (emphasis added) <u>Id.</u> (citing <u>Nobles</u>, 127 F.3d at 420). It is not enough for a petitioner to raise the claims in the lower state courts, if they were not also specifically presented to the Louisiana Supreme Court. <u>See</u> <u>Baldwin v. Reese</u>, 541 U.S. 27, 32 (2004) (a prisoner does not fairly present a claim to a state court if that court must read beyond a petition or brief, such as a lower court opinion, to find the claim).

Thus, to have exhausted his claims in state court, Crump must fairly present the same claims and legal theories he urges in this federal court to the state courts through to the Louisiana Supreme Court in a procedurally proper manner and have given that court an opportunity to address those claims.  Crump concedes he has <u>not</u> yet done so as to the ineffective assistance of counsel claims.  I am also not convinced by this record or the appellate decision that his claim that the State's failure to present adequate evidence establishing him as the perpetrator violated his "rights to confrontation, cross-examination, counsel, and due process."

As discussed above, the record discloses no good cause for Crump's failure to exhaust these claims, and this court can find none.  <u>See</u> <u>Rhines</u>, 544 U.S. at 278.  Having shown no good cause for his failure to exhaust, this petition should be dismissed without prejudice to allow Crump to exhaust available state court remedies, <u>unless</u> he amends or resubmits this habeas petition to present <u>only</u> exhausted claims.  <u>Pliler</u>, 542 U.S. at 233; <u>Whitehead</u>, 157 F.3d at 387.

## **<u>RECOMMENDATION</u>**

For the foregoing reasons, it is **RECOMMENDED** that Crump's request for a stay of these proceedings be **DENIED**.

It is further **RECOMMENDED** that Crump's petition for issuance of a writ of habeas corpus under 28 U.S.C. § 2254 be **DISMISSED WITHOUT PREJUDICE** for

failure to exhaust state court remedies, unless he amends his petition to dismiss the unexhausted claims and pursue only the exhausted claims.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  Douglass v. United Servs. Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc) (citing 28 U.S.C. § 636(b)(1)).[20]

New Orleans, Louisiana, this _____7th_____ day of March, 2014.

JOSEPH C. WILKINSON, JR.
UNITED STATES MAGISTRATE JUDGE

___

[20]Douglass referenced the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend the period to fourteen days.